UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------
MADELEINE KLINGS,

               Plaintiff,

                               **MEMORANDUM AND ORDER**

-against-                     04-CV-3400(KAM)(LB)


NEW YORK STATE OFFICE OF COURT
ADMINISTRATION,

               Defendant.
------------------------------------

**MATSUMOTO, United States District Judge:**

        Plaintiff Madeleine Klings ("Klings") brings this action against her employer, the New York State Office of Court Administration (the "OCA" or "defendant"), alleging religious and gender discrimination for failure to promote under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq*. Defendant has moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, defendant's motion is granted in part and denied in part.

<u>**BACKGROUND**</u>

        The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1,[1] are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of

---

[1] References to paragraphs of the parties' 56.1 statements include materials cited therein and annexed thereto.

their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

## A. Plaintiff's Employment History

Klings, a Jewish woman, started working for the New York State Unified Court System (the "UCS") as a Court Assistant for the Civil Court in New York County in May 1986, returned to her former employer in November 1986, and then was reinstated by the defendant in July 1987 in New York County. (Doc. No. 41, Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1") ¶¶ 15-17.) Upon the recommendations of Chief Clerk Jack Baer ("Baer") and after taking civil service and promotional examinations, Klings was subsequently promoted to Senior Court Clerk in 1989, to Associate Court Clerk in 1990, and to Principal Court Clerk in 1994. (Def.'s 56.1 ¶¶ 18-20.) In 1996, Klings was transferred to the Civil Court, Kings County, where she worked as Principal Court Clerk at the time of the events at issue. (Def.'s 56.1 ¶¶ 20-21.) Defendant does not dispute plaintiff's allegation that, in her capacity as Principal Court Clerk (JG-26 level), she performed numerous administrative duties, supervised the work of approximately 55 employees, ran numerous training programs for court staff and significantly improved the court's record-keeping procedures. (Doc. No. 18, Second Am. Compl. ¶ 23.)

2

**B. Structure of the Unified Court System**

The OCA is the managing administrative office for the UCS. (Def.'s 56.1 ¶ 3.) The UCS is comprised of individual courts, distinguished by subject matter — such as the Civil Court, Criminal Court, and Family Court. Each court has a branch in every county of New York City. Chief Clerk Baer manages all of the county branches of the Civil Court of the City of New York. (Def.'s 56.1 ¶ 9.) In his capacity as Chief Clerk, Baer supervises, *inter alia*, the Civil Court's non-judicial staff, including Klings, prepares the budget and handles employee relations, such as hiring. (Doc. No. 42, Affidavit of Jack Baer ("Baer Aff.") ¶¶ 2, 4.) Baer receives assistance from Deputy Chief Clerks in each borough. (Def.'s 56.1 ¶ 9.) Stewart Feigel ("Feigel") retains the Deputy Chief Clerk position in Kings County. (Def.'s 56.1 ¶ 9.) Feigel, in turn, receives assistance from Angelo Tropea. (Def.'s 56.1 ¶ 9.)

**C. The Assistant Deputy Chief Clerk Positions and the UCS's Job Reclassification Policy**

In 2000, the Civil Court sought to reclassify positions into four Assistant Deputy Chief Clerk positions for the purpose of utilizing the positions to manage each borough's Civil Court operations (excluding Staten Island). (Def.'s 56.1 ¶ 45; Baer Aff. ¶ 6.) These reclassified positions were ranked

at the JG-28 level.[2]  (Def.'s 56.1 ¶ 12.)  A similar

organizational restructuring had already taken place in the

landlord tenant section of the Civil Court, as well as

throughout the Criminal and Family Courts.  (Baer Aff. ¶ 6.)

        Instead of filling the positions through a formalized

job announcement and interview process, the OCA chose to offer

them through the job "reclassification" process because of labor

relations, personnel and operations reasons.  (Def.'s 56.1 ¶ 45;

Doc. No. 42, Affidavit of Jeanne Colucci ("Colucci Aff.") ¶¶ 5,

9, 12.)  For example, in 1996, the OCA abolished certain lower

level positions to create Assistant Deputy Chief Clerk positions

in Housing Court in each borough but encountered union

complaints.  (Def.'s 56.1 ¶ 46.)

        Reclassification of a job entails changing a job

title, and often, the responsibilities associated with that

title.  (Doc. No. 44, Def.'s Mem. in Supp. at 4-5 and documents

cited therein.)  The UCS has an official policy for the

reclassification of positions.  Pursuant to the Rules of the

Chief Judge, N.Y. Comp. Codes R. & Regs. TIT. 22, § 25.5 (2010),

the Chief Administrative Judge, upon review of all

recommendations and supporting information, may "reclassify" any

position in the UCS (the "section 25.5 reclassification

policy").  (Def.'s 56.1 ¶ 44; *see also* Doc. No. 42, Ex. B,

---

[2] Klings's civil service title, Principal Court Clerk, ranks at the JG-26
level.  (Def.'s 56.1 ¶ 21.)

Deposition of Jack Baer ("Baer Dep.") at 63-65.) According to the UCS internal hiring manual, when a current "incumbent"[3] is being appointed to the reclassified position, a formal employment announcement is not required to effectuate the reclassification. (Def.'s 56.1 ¶ 44; *see also* UCS Manual at 1.)

During a closed meeting in March 2000, Baer offered the opportunity for job reclassifications to four men: Associate Court Clerk[4] (JG-23) Andrew Hassell, Principal Court Clerk[5] (JG-26) Ronald Romano, Principal Court Clerk (JG-26) Joseph Traynor, and Principal Court Clerk (JG-26) Mark Spiritus. (Def.'s 56.1 ¶ 49.) Three of these men – Spiritus, Romano, and Hassell – were previously nominated as alternates by a 1999 interview panel for an Assistant Deputy Chief Clerk position in the Civil Court's Housing Part. (Def.'s 56.1 ¶ 48.) Because Spiritus decided to accept a competitive position as Senior Management Analyst (JG-28) for the OCA instead, he declined Baer's

---

[3] The hiring manuals do not define the term "incumbent." (*See* Doc. No. 42, Ex. F, Personnel Office Bulletin No. 89-4(a) ("Personnel Bulletin") at 3; Doc. No. 42, Ex. G, Uniform Procedures for Appointment/Promotion ("UCS Manual") at 1.)

[4] Associate Court Clerk, which ranks at the JG-23 level, is a subordinate title to Principal Court Clerk, Klings's title. According to the official title description, "Associate Court Clerks work as supervisors of a staff of part clerks and other personnel, review complex or unusual documents for legal-technical sufficiency, or supervise . . . employees engaged in clerical support activities." (Doc. No. 42, Ex. D, Official Title Description ("Title Description") at Associate Court Clerk.)

[5] Principal Court Clerk ranks at the JG-26 level. According to the UCS's official job description, Principal Court Clerks "apply extensive knowledge to complex problems related to special term, calendaring, or other special parts. They may also supervise units staffed by . . . subordinate personnel, be designated to act in the absence of the Chief Clerk . . . , and perform other related duties." (Title Description at Principal Court Clerk.)

reclassification offer, and Associate Court Clerk (JG-23)
Michael Boyle was alternately offered the reclassified position.
(Def.'s 56.1 ¶ 50.)  All four employees reclassified to the
Associate Deputy Chief Clerk positions were men, and, according
to the Second Amended Complaint, of the four who accepted the
position, none were Jewish.[6]  (Second Am. Compl. ¶ 26.)  The
reclassifications, as approved by Chief Administrative Judge Ann
Pfau, were effectuated on September 28, 2000.[7]  (Def.'s 56.1
¶ 52; Doc. No. 42, Exs. U & V.)

     After hearing rumors of certain employees receiving
reclassifications, on or around September 12, 2000, two weeks
prior to the effectuation of the reclassifications, Klings filed
a formal application for reclassification of her existing
Permanent Court Clerk position to an Assistant Deputy Chief
Clerk position or Court Clerk Specialist.  (Second Am. Compl.
¶ 51; Doc. No. 42, Ex. W.)  However, by a memorandum dated
November 3, 2000, Baer informed Klings that he would not support
her request to be reclassified because Ronald Romano had been
reclassified to serve the Assistant Deputy Chief Clerk position

---

[6] Klings alleges that at the time of the reclassification, there were seven
employees holding the position of Principal Court Clerk within the New York
City Civil Court, including plaintiff, and, of those seven, four were Jewish
and plaintiff was the only female.  (Second Am. Compl. at ¶ 28.)
[7] As finalized, Ronald Romano's reclassification transferred him from Bronx
County to Kings County.  Joseph Traynor was assigned to Queens County, Andrew
Hassell was assigned to Bronx County, and Michael Boyle was assigned to New
York County.  (Def.'s 56.1 ¶ 53.)

in her court, Kings County.  (Second Am. Compl. ¶¶ 52-53; Doc.
No. 42, Ex. X, 11/3/00 Mem. re: Request for Reclassification.)

### D. Administrative Proceedings and the Instant Complaint

In response to the November 3, 2000 memorandum
informing Klings that she would not be reclassified, Klings
contacted the Equal Employment Opportunity Commission ("EEOC")
and her union representative, but did not file a complaint or
grievance for her allegations of discrimination.  (Def.'s 56.1
¶¶ 77-78.)  She did, however, file an administrative complaint
with the New York State Division of Human Rights ("SDHR")
against the OCA around May 11, 2001.  (Def.'s 56.1 ¶ 79.)  Her
complaint alleged that she was subjected to unlawful
discrimination because of sex, age, and religion, related to her
non-selection for appointment in 2000.  (Def.'s 56.1 ¶ 79.)  The
UCS responded, asserting that her non-selection had nothing to
do with discriminatory practices or intentions.  (Def.'s 56.1
¶ 80.)  By Determination and Order After Investigation, dated
March 26, 2004, the SDHR found that there was "no probable
cause" to believe that any unlawful discrimination had occurred
and the charges were dismissed.  (Def.'s 56.1 ¶ 81.)  The EEOC
adopted the SDHR's findings and issued a right to sue letter.
(Doc. No. 1, Compl., Ex. B.)

After receiving a right to sue letter from the EEOC on
or about May 13, 2004, Klings filed a *pro se* Complaint in the

Eastern District of New York on August 9, 2004, alleging age discrimination under the ADEA, and discrimination based on sex and religion under Title VII. (Def.'s 56.1 ¶ 82; Compl. & Exs. A & B.) Klings retained counsel and, on February 1, 2005, filed an Amended Complaint expounding on the same causes of action.[8] (Def.'s 56.1 ¶ 82; Doc. No. 8, Am. Compl.) On August 8, 2005, Klings filed a Second Amended Complaint, adding, *inter alia*, allegations of retaliation and discrimination based on her Jewish ancestry, in addition to her religion.[9] (Def.'s 56.1 ¶ 83; Second Am. Compl.) By "so ordered" stipulation dated May 21, 2009, the third through ninth causes of action were voluntarily dismissed. (Def.'s 56.1 ¶ 84.) Thus, only the first and second causes of action alleging discrimination based on gender and religion under Title VII remain before this court. (Def.'s 56.1 ¶ 84.)

In the instant complaint, Klings claims that, by failing to promote her to one of the four Assistant Deputy Chief Clerk positions, the OCA unlawfully discriminated against her on the basis of her gender and religion. (Second Am. Compl. ¶¶ 64, 66.) Although it is undisputed that no employee in the UCS has

---

[8] By a stipulation filed June 27, 2005, the ADEA claim was withdrawn. (Def.'s 56.1 ¶ 82; Doc. No. 15, Stipulation and Order of Withdrawal.)

[9] At the parties' request, discovery was placed on hold in September 2005 (Doc. No. 20), and the case was stayed on May 1, 2007 because the plaintiff was suffering from serious health conditions. (05/01/07 Order.) The case was re-opened on January 15, 2008 on consent of the parties. (01/15/08 Order.)

ever subjected Klings to any offensive remarks pertaining to her gender or religion (Def.'s 56.1 ¶ 85), Klings claims that gender and religious animus can be inferred from the OCA's deviation from the UCS's section 25.5 reclassification policy and from the OCA's failure to document any alleged negative criticism in her performance evaluations. (Second Am. Comp. ¶¶ 16, 30-40, 64, 66; Doc. No. 45, Pl.'s Mem. in Opp. at 12-21 and documents cited therein.) Specifically, Klings claims that: 1) her educational background and experience with the Civil Court made her just as, if not more, qualified than the four men selected, (Second Am. Compl. ¶¶ 41-50; Pl.'s Mem. in Opp. at 11, 18-21 and documents cited therein); 2) that Romano, Hassell and Boyle[10] were not eligible for reclassification because they were not "incumbents," (Second Am. Compl. ¶¶ 34-40; Pl.'s Mem. in Supp. at 12-16 and documents cited therein); and 3) that the lack of any documented criticism of her job performance demonstrates that the OCA's true motivating factor for not promoting her was unlawful discrimination. (Second Am. Compl. ¶ 16; Pl.'s Mem. in Opp. at 19-21 and documents cited therein.)

### E. The OCA's Motion for Summary Judgment

The OCA moves for summary judgment, arguing that Klings cannot prove that her non-selection for reclassification was the product of discrimination based on gender or religion.

---

[10] Klings does not appear to take issue with Traynor's reclassification.

(*See generally* Def.'s Mem. in Supp.)  The OCA contends that its decision to not reclassify Klings was based on legitimate, non-discriminatory reasons – specifically, her poor management style and lack of requisite interpersonal skills, rather than any unlawful discrimination.  (Def.'s Mem. in Supp. at 1-2, 15-16 and documents cited therein.)

Defendant specifically asserts that plaintiff has failed to make out a *prima facie* case of either religious or gender discrimination and, alternatively, that she has not produced sufficient evidence to support a rational finding of pretext.  (*See generally* Def.'s Mem. in Supp.; Doc. No. 49, Def.'s Reply Mem.)  In response to Klings's religious discrimination claim, the OCA submits that one of the four reclassfications was originally offered to Principal Court Clerk Mark Spiritus, who, according to his affidavit, is Jewish.  (Def.'s Mem. in Supp. at 13 and documents cited therein; Affidavit of Mark Spiritus ("Spiritus Aff.") ¶¶ 1, 2, 5.)  Further, in response to plaintiff's gender discrimination claim, the OCA asserts that since 1996, females have filled six out of the twelve Assistant Deputy Chief Clerk vacancies.  (Def.'s 56.1 ¶¶ 27, 28, 30, 31, 36-39, 41-42, 90.)  Additionally, for the reclassifications in question, all of the decision-makers who approved Baer's reclassification selections were female.  (Def.'s 56.1 ¶ 92.)

The OCA finally contends that it did, in fact, adhere to the UCS's Section 25.5 reclassification policy when reclassifying the four positions and that it orally conveyed, through its supervisors, criticisms of Klings's job performance privately to Klings on numerous occasions. (Def.'s Mem. in Supp. at 11-12, 16 and documents cited therein.) Thus, the OCA argues that there are no disputed issues of material fact surrounding its legitimate, nondiscriminatory reasons for not promoting Klings, and the case should be dismissed.

## DISCUSSION

### A. Legal Standard

The court will grant summary judgment only if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that there is "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id*.

The moving party has the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, the court must construe the facts in the light most favorable to the nonmoving

party, and all inferences must be drawn in her favor. *Anderson*, 477 U.S. at 255. Nevertheless, the nonmoving party may not rest "merely on allegations or denials," but must instead "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2).

As employment discrimination cases often turn on the employer's intent, the court must be cautious about granting summary judgment, because "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Parikh v. New York City Transit Auth.*, --- F. Supp. 2d ----, 2010 WL 364526, at *4 (E.D.N.Y. Feb. 2, 2010) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)). However, the Second Circuit has noted that summary judgment remains wholly available in discrimination cases, and that district courts "should not 'treat discrimination differently from other ultimate questions of fact.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993))).

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000(e)(2)(a)(1).  In order to
rule upon a motion for summary judgment in a case of
discriminatory failure to promote, in violation of Title VII,
courts apply the three-part burden-shifting framework of
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).
Initially, the plaintiff must establish, by a preponderance of
the evidence, a *prima facie* case of discrimination by showing
that: 1) she is a member of a protected class; 2) she was
qualified for the job she sought; 3) she was denied the job; and
4) the denial occurred under circumstances giving rise to an
inference of unlawful discrimination under Title VII.  *See*
*McDonnell Douglas*, 411 U.S. at 802; *Byrnie v. Town of Cromwell*
*Bd. of Ed.*, 243 F.3d 93, 101 (2d Cir. 2001).  The Second Circuit
has "characterized this burden as '*de minimis*:' it is 'neither
onerous, nor intended to be rigid, mechanized or ritualistic.'"
*Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)
(quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456,
467 (2d Cir. 2001)).  The burden, however, "is not nonexistent"
and if "the plaintiff fails to establish any element of his
*prima facie* case, summary judgment is appropriate." *Crews v.*
*The Trs. of Columbia Univ.*, 452 F. Supp. 2d 504, 522 (S.D.N.Y.
2006) (citing *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123,
126-27 (2d Cir. 2004)).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-03. The employer's "burden is one of production, not persuasion . . . and involves no credibility assessment of the evidence." *Pathare v. Klein*, No. 06-CV-2202, 2008 WL 4210471, at *4 (S.D.N.Y. Sept. 12, 2008) (citations omitted). At this stage, the employer "must present a clear explanation for the action." *Id.* (citation omitted).

If the employer meets its burden, the plaintiff must present evidence to show that the employer's reason is a mere pretext for an impermissible discriminatory motive. *McDonnell-Douglas*, 411 U.S. at 804; *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006); *Byrnie*, 243 F.3d at 93 (school's decision to not promote plaintiff based on a subjective interview process, despite glaringly superior qualifications, raised factual issues sufficient to defeat summary judgment). In the summary judgment context, this means the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision . . . is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment

decision." *See Gallo v. Prudential Residential Servs., Ltd.*
*P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994).

**B. Analysis**

**1. Religious Discrimination Claim**

To satisfy her initial burden under *McDonnell Douglas*,
Klings must present a *prima facie* case of religious
discrimination.  Here, the first three prongs of the *prima facie*
case are easily satisfied.  First, the OCA does not contest
either that Klings, who practices the Jewish religion, belongs
to a protected class, or second, that she was qualified for the
position.  (Def.'s Reply at 2 ("It is undisputed that plaintiff
met the qualifications for appointment set forth in the
Assistant Deputy Chief Clerk title standard.").)  Third, it is
evident that Klings was not selected for a reclassification to
one of the Assistant Deputy Chief Clerk positions.  However, the
court finds that Klings has failed to present sufficient facts
to establish the fourth prong of her *prima facie* case; namely,
that the failure to promote Klings occurred under circumstances
giving rise to an any inference of discrimination based on her
being Jewish.

The Second Circuit has stated that "there is no
unbending or rigid rule about what circumstances allow an
inference of discrimination," and that the fourth element is "a
flexible one that can be satisfied differently in differing

15

factual scenarios." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  One method for establishing the fourth prong is showing that a person outside of the protected class ultimately received the reclassification.  *See Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  On the other hand, proof that the individual receiving the reclassification was *within* the protected class can undermine the plaintiff's attempt to establish a *prima facie* case of intentional discrimination.  *See Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 371 (S.D.N.Y. 2000) (finding plaintiff's "fail[ure] to show that the position was ultimately filled by a person not of the protected class" undermined his *prima facie* case of Title VII discrimination); *see also Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 262 (E.D.N.Y. 1999) ("While there is no *per se* rule that a plaintiff in a discrimination case must demonstrate that she was replaced by a person outside the protected class, nonetheless, [that fact] weighs heavily against an inference that [plaintiff] was discriminated against.")(citation omitted); *Estepa v. Shad*, 652 F. Supp. 567, 570 n. 5 (E.D.N.Y. 1987) ("[A]bsent other facts from which inferences can be drawn, unless a Title VII plaintiff is replaced by a member of a nonprotected class, proof of intentional discrimination seems extremely difficult, if not practically impossible.")

Here, Klings premises her inference of religious discrimination upon her allegation that, out of the four Jewish employees holding the position of Principal Court Clerk, none of them were "offered the opportunity to have [their] position reclassified and upgraded." (Second Am. Compl. ¶ 29; *see also* Pl.'s Opp. at 25-26.) However, the OCA presents admissible undisputed evidence that Mark Spiritus, a Jewish man and former Principal Court Clerk, was first offered the upward reclassification to Assistant Deputy Chief Clerk during Baer's March 2000 meeting with potential appointees. (Def.'s 56.1 ¶ 49; Doc. No. 42, Spiritus Aff. ¶¶ 1-2, 5.) Spiritus declined the opportunity because he had received another offer at the JG-28 salary level, which would be effectuated at an earlier fiscal date. (Def.'s 56.1 ¶ 50; Doc. No. 42, Spiritus Aff. ¶¶ 3-5.)

In the face of this evidence, Klings cannot argue that Spiritus was not offered the opportunity to have his position reclassified to Assistant Deputy Chief Clerk; instead, she argues that he was only invited to submit an application for reclassification, but that he was not actually reclassified to that position. (Doc. No. 46, Pl.'s 56.1 ¶ 86; Pl.'s Mem. in Opp. at 25.) While it is true that an invitation to submit an application for reclassification is not the same thing as being reclassified, it is clear that Baer's March 2000 meeting with Spiritus consisted of an offer to begin the administrative

process that would result in his job reclassification and promotion.  This is demonstrated by the undisputed fact that the other three meeting attendees who accepted the reclassification offer — Traynor, Hassell, and Romano — all were officially reclassified and promoted on September 28, 2000.  (Def.'s 56.1 ¶¶ 51-52.)  Accordingly, the fact that an individual within the protected class was first given the opportunity for reclassification to the Assistant Deputy Chief Clerk position significantly undercuts Klings's ability to make out her *prima facie* case of religious discrimination, absent other circumstances from which a jury could infer discrimination.

Although given ample opportunity, Klings has failed to present such circumstances.  First, Klings concedes that she has never been subject to negative or offensive remarks concerning her religion.  (Def.'s 56.1 ¶ 85; Pl.'s 56.1 ¶ 85.)  Likewise, Klings concedes that she has no reason to believe that Baer, an ultimate decision maker on hiring choices, is "generally anti-Semitic."  (Doc. No. 48, Declaration of Madeleine Klings ("Klings Decl.") ¶ 29; *see also* Doc. No. 42, Ex. A, Deposition of Madeline Klings ("Klings Dep.") at 102, 143; Pl.'s Mem. in Opp. at 26.)  It is further undisputed that Baer selected or recommended Klings for at least three promotions during her tenure as an OCA employee.  (Def.'s 56.1 ¶¶ 18-20, 55; Baer Aff. ¶ 4 ("I have selected or nominated [Klings] for appointment for

every permanent civil service position she has held throughout her career . . . in the Civil Court.").)

Moreover, neither the deposition of Deputy Chief Clerk Stewart Feigel nor the declaration of Samuel Achtman,[11] upon which Klings relies in support of her religious discrimination claim, provides evidence from which a jury could infer religious discrimination. (Pl.'s Mem. in Opp. at 24-27.) First, plaintiff argues that Feigel, whom she characterizes as the "one Jewish employee holding a noncompetitive supervisory title" in New York City Civil Court,[12] has observed an "institutional bias" against appointing Jewish employees to upper-level management at the OCA. (Pl.'s Opp. at 24.) However, plaintiff grossly mischaracterizes Feigel's deposition testimony. During his deposition, Feigel testified that, except for Klings, no employee who has complained of discrimination complained that they were being discriminated against because they were Jewish and definitively stated, "I have to tell you, as somebody who is Jewish, I have never seen in [the] OCA anybody say or do

---

[11] Mr. Achtman is a Principal Court Clerk in Family Court and member of the Shomrim Society of the New York State Courts, an organization primarily composed of Jewish non-judicial employees of the OCA, which addresses, *inter alia*, fairness and equal opportunity in the workplace. (Doc. No. 51, Declaration of Samuel Achtman ("Achtman Decl.") ¶¶ 1-3.)

[12] This statement is not supported by the evidence. As plaintiff points out, the UCS does not keep statistics on the religious affiliation of its employees. (Pl.'s Opp. at 24; Colucci Aff. ¶ 16.) Further, although Klings cites to Feigel's deposition in support of the statement that Feigel is "the one Jewish employee holding a noncompetitive supervisory title" in New York City Civil Court, Feigel, who, incidentally, is not an institutional witness, qualified his statements on this topic by stating that he does now "know what the religion is of most of the people [who hold titles above JG-26 level]." (Doc. No. 42, Ex. C, Deposition of Stewart Feigel ("Feigel Dep.") at 63, 65.)

anything that would indicate to me that someone was not hired for a job because they are Jewish." (Feigel Dep. at 43-44, 58.) Feigel further opines that it is his own "philosophical belief" that any difficulty Jewish employees have receiving promotions above the level of testing for Civil Service jobs within the OCA is likely due to the "systemic . . . Jewish philosophy" that "it's not the right thing to do, to push somebody because they're Jewish" whereas "people of other groups will push members of their group." (Feigel Dep. at 48-49, 60.) Feigel, however, could not identify any instances to support his philosophical beliefs. (Feigel Dep. at 48-60 ("Does that mean that I know of any instance where somebody has done that? No, I don't. . . . Again, it's a philosophical point.")

Even if Feigel's self-proclaimed "philosophical belief" that, as a group, Jewish people do not affirmatively push other Jewish people for promotions is true, contrary to Klings's bald assertion, this does not suggest that the OCA has an institutional bias against Jewish employees. First, Feigel repeatedly testified that he does not have any personal knowledge of this phenomenon happening in the OCA. Further, even if true, Feigel's statement would suggest that Jewish superiors are not impermissibly engaging in a form of reverse discrimination, by blindly advocating for the promotion of Jewish employees over non-Jewish employees. Thus, Klings's

mischaracterization of Feigel's testimony fails to create an
inference of discrimination.

Likewise, the arguable hearsay statement of Samuel
Achtman that Chief Administrative Judge Ann Pfau[13] once
"acknowledged" *in October of 2005* that Jewish non-judicial
employees have trouble getting promoted to supervisory positions
in proportion to their representation at the OCA (Achtman Decl.
¶ 4) (emphasis added), is too far removed from the period of
time in question and too general to connect the fact that Klings
did not obtain the reclassification she desired in 2000 with her
membership in a protected class.[14] *See, e.g.*, *Spiegler v. Israel*
*Discount Bank of New York*, No. 01-CV-6364, 2003 WL 21488040, at
*10 (S.D.N.Y. June 25, 2003) (finding comment proffered by
plaintiff to support an inference of discrimination irrelevant
to that determination where plaintiff could not "demonstrate a
nexus in time or otherwise" between the comment and "the
complained of personnel action").

Finally, while there is no conclusive presumption that
a person will not discriminate against members of his or her own
protected class, *Feingold v. New York,* 366 F.3d 138, 155 (2d

---

[13] Notably, Chief Administrative Judge Ann Pfau approved the reclassifications
at issue in 2000.  (Doc. No. 42, Exs. S & V; Colucci Aff. ¶ 12.)
[14] As noted, *supra*, Klings's allegation in her opposition that the OCA "by-
passed" Marvin Rose, "another Jewish incumbent" for the same 2000
reclassification (Pl.'s Opp. at 25-26), is insufficient, without additional
evidence, to create an inference of discriminatory intent, where it is
undisputed that the defendant offered the reclassification and promotion to
another Jewish employee.

Cir. 2004), statements from Klings's Jewish superiors, Feigel and Deputy Supervising Judge Karen B. Rothenberg, that they would not have recommended Klings for promotion to upper-level management certainly do not further an inference of religious discrimination. (*See* Feigel Dep. at 178-179; Doc. No. 42, Affidavit of Hon. Karen B. Rothenberg ("Rothenberg Aff.") ¶¶ 1, 4.) *See, e.g.*, *Eder v. City of New York*, No. 06-CV-13013, 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (finding plaintiff failed to make out a *prima facie* case of religious discrimination under Title VII where plaintiff's "immediate supervisor who assessed Plaintiff's performance and determined that it was lacking, are members of the same protected class" and, therefore, holding that "any inference of discrimination, without additional evidence, is not warranted."); *see also Tucker v. New York City*, No. 05-CV-2804, 2008 WL 4450271, at *5 (S.D.N.Y. Sep. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African-American."); *cf. Feingold*, 366 F.3d at 155 (citing *Oncale v. Sundowner Offshore Servs*., 523 U.S. 75, 78 (1998)) (rejecting "the district court's suggestion that an inference of discrimination cannot be drawn because [plaintiff] was fired by another Jew" because "[i]t is no more reasonable to presume that

individuals will not discriminate against practitioners of their own religious faith.")

Thus, viewing the record as a whole, despite the flexibility that *McDonnell Douglas* articulates for this fourth prong of the *prima facie* case, Klings has failed to identify any evidence from which a rational jury could infer that the OCA's decision not to reclassify and promote Klings gives rise to an inference of religious discrimination, other than her own conclusions that she is being discriminated against based on her Jewish faith. *Bickerstaff v. Vassar College,* 196 F.3d 435, 456 (2d Cir. 1999) (Plaintiff's "feelings and perceptions 'of being discriminated against are not evidence' of discrimination.") (quoting *Fisher v. Vassar College*, 70 F.3d 1420, 1439 (2d Cir. 1995)); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (To survive a summary judgment motion, a plaintiff must allege specific facts, as she "must provide more than conclusory allegations of discrimination . . ..").

As Klings has failed to present a *prima facie* case of Title VII discrimination based on her religion, the OCA's motion for summary judgment is granted as to plaintiff's religious discrimination claim, and plaintiff's Second Cause of Action is dismissed. *See, e.g.*, *Morris v. New York City Dept. of Sanitation*, No. 99-CV-4376, 2003 WL 1739009, at *5-7 (S.D.N.Y. Apr. 2, 2003) (granting summary judgment where

plaintiff failed to raise an inference of discrimination

sufficient to satisfy the fourth element of his *prima facie*

claim).

**2. Gender Discrimination Claim**

**a. *Prima Facie Case***

Klings has presented a *prima facie* case of

discrimination based on gender. Klings, as a woman, is a member

of a protected class. *Winston v. Verizon Servs. Corp.*, 633 F.

Supp. 2d 42, 49 (S.D.N.Y. 2009). Further, as indicated, *supra*,

Klings was concededly qualified for the reclassification sought,

but was not selected.

Moreover, Klings has provided sufficient evidence

giving rise to an inference of discrimination based on gender by

showing that the reclassification was given to someone outside

of her protected class. *See Zimmerman*, 251 F.3d at 381. It is

undisputed that the four individuals offered the opportunity for

reclassification in March 2000, and those ultimately appointed

in September 2000, were all men. (Def.'s 56.1 ¶¶ 49-50, 52.)

While Klings concedes that she had not been subjected to any

negative or offensive remarks concerning her gender (Def.'s 56.1

¶ 85), given plaintiff's *de minimis* burden at the *prima facie*

stage, the fact that four men were promoted is sufficient for

Klings to satisfy her initial burden in this case. *See de la*

*Cruz v. New York City Human Res. Admin. Dept. of Soc. Servs.*, 82

F.3d 16, 20 (2d Cir. 1996) (Hispanic plaintiff satisfied fourth prong by showing a non-Hispanic person replaced him); *Aurelien v. Henry Schein, Inc.*, No. 07-CV-2358, 2009 WL 366148, at *8 (E.D.N.Y. Feb. 12, 2009) (male plaintiff satisfied fourth prong by showing that two women were promoted over him).

### b. Legitimate, Non-Discriminatory Reason

In response to Klings's *prima facie* showing, the OCA has proffered evidence of its nondiscriminatory reasons for its decision to not promote Klings; namely, that she does not possess the skill set necessary to perform the upper-level managerial responsibilities associated with the Assistant Deputy Chief Clerk position. (Baer Aff. ¶¶ 5-13; Doc. No. 42, Affidavit of Angelo Tropea ("Tropea Aff.") ¶¶ 1-2, 9; Def.'s Mem. in Supp. at 15-16 and documents cited therein.)

In support of this contention, the OCA has produced admissible affidavits from Klings's supervisors and subordinates. Affidavits from Klings's supervisors attest that while Klings is an "excellent technician within the framework of her court clerk job," and pays strong attention to detail, Klings's "limitations include slow production and decision-making, personality issues, micromanagement practices, lack of flexibility and interpersonal conflicts with court staff, who find it difficult to work with her." (Baer Aff. ¶ 5; *see generally* Tropea Aff.; Doc. No. 42, Renee Simpson Rudder

25

("Rudder Aff."); Rothenberg Aff.) Chief Clerk Baer, Klings's
supervisor of fifteen years who had approved her prior
promotions, stated his view that that her "deficiencies ruled
her out as a serious candidate for reclassification to Assistant
Deputy Chief Clerk." (Baer Aff. ¶¶ 4, 10.) He further stated
that she was a "nitpicker of picayune detail to the point of
being counterproductive and obstructive, which is well-known to
court administrators familiar with her work over the years."
(Baer Aff. ¶ 5.)

        Moreover, the OCA submits evidence from Klings's
supervisors stating that they received numerous complaints from
Klings's subordinates concerning her abrasive personality, lack
of respect for others and attempts to micro-manage them (see
Tropea Aff. ¶¶ 2-3; Feigel Dep. at 129-148), as well as evidence
from the subordinates themselves. (See Doc. No. 42, Affidavit
of Mary Price ("Price Aff.") ¶¶ 3-6 (plaintiff "is a
micromanager to the extreme" who "does not know how to deal with
people"); Doc. No. 42, Affidavit of Barry Shapiro ("Shapiro
Aff.") ¶¶ 2-3, 5 (plaintiff "was condescending," "had no people
skills," "a personality that drove employees away," and "could
be heavy-handed with court staff, diminishing morale").) Thus,
the OCA has proffered legitimate, nondiscriminatory reasons for
its decision to not reclassify Klings. *See Gill v. Mt. Sinai
Hosp.*, No. 02-CV-1651, 2004 WL 5461069, at *8 (S.D.N.Y. June 22,

2004) ("lack of interpersonal skills and confrontational attitude" constituted a legitimate, nondiscriminatory reason for adverse employment action).

### c. Pretext

Because the OCA has presented evidence of its legitimate, nondiscriminatory reasons for its decision to not offer plaintiff the reclassification and promotion, Klings may no longer rely on the presumption of discrimination afforded to the *prima facie* case. *See St. Mary's Honor Ctr.*, 509 U.S. at 510-11 ("The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture."); *Holcomb v. Iona College*, 521 F.3d 130, 138, 141 (2d Cir. 2008). Without the aid of any presumption, the next inquiry is whether Klings has presented sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the defendant's legitimate, non-discriminatory explanation for the decision to not promote her was pretextual and was instead motivated, at least in part, by unlawful animus based on Klings being female. *Holcomb*, 521 F.3d at 141.

Direct evidence of employer discrimination is frequently unavailable. *See Reeves*, 530 U.S. at 141. This case is no exception. Because Klings cannot offer direct evidence of an improper discriminatory motive, she must rely on evidence

proffered in her *prima facie* case, and supporting circumstantial evidence, to show that the OCA's reasons are a pretext for discrimination. *See Byrnie*, 243 F.3d at 102. To accomplish this, she may rely on weaknesses or contradictions in the OCA's proffered reasons to expose them as "unworthy of credence." *Reeves*, 530 U.S. at 143 (citing *Burdine*, 450 U.S. at 256). "It is not sufficient, however, for a plaintiff merely to . . . put forward 'evidence from which a factfinder could find that the employer's explanation . . . was false.'" *Aurelien*, 2009 WL 366148, at *8 (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000)). "Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination." *Id.*, at *8; *see also Connell v. Consol. Edison Co. of New York, Inc.*, 109 F. Supp. 2d 202, 208 (S.D.N.Y. 2000).

Klings argues that there is sufficient evidence from which a reasonable trier of fact could find that the OCA failed to select her for reclassification because she was female. First, Klings claims that there are material issues of fact about whether the OCA violated its reclassification policy when appointing four men to the Assistant Deputy Chief Clerk positions in September 2000, and whether such deviation was for

an impermissible purpose. (Pl.'s Mem. in Opp. at 12-16.)

Second, Klings asserts that there are genuine issues of material

fact surrounding the legitimacy of any criticism about her work

performance and personality, especially in light of the OCA's

failure to memorialize any such complaints in writing as well as

the allegedly gender-based content of the criticism. (Pl.'s

Mem. in Opp. at 16-21.) Klings offers evidence that she was

just as qualified, if not more so, than the men promoted, and

that the "contradictions between the contemporaneously produced

performance evaluations and [OCA's] after-the-fact

justifications for considering [her] unsuitable for promotion

surely raise a significant issue of fact for a jury." (Pl.'s

Mem. in Opp. at 19.)

i.    Adherence to the Reclassification Policy

In order to bolster the argument that the OCA's

failure to promote her raises an inference of discrimination,

Klings contends that the OCA violated its own procedures by

failing to post a formal job announcement for the

reclassifications, thus suggesting an impermissible,

discriminatory motive. (Pl.'s Mem. in Opp. at 12-16.)

While courts are hesitant to second-guess an

employer's hiring standards, these standards are subject to

scrutiny under Title VII in some circumstances. "[D]epartures

from procedural regularity, for example, can raise a question as

to the good faith of the process where the departure may
reasonably affect the decision." *Stern v. Trs. of Columbia
Univ. in City of New York*, 131 F.3d 305, 313 (2d Cir. 1997)
(internal quotation marks omitted) (quoting *Zahorik v. Cornell
Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)); *see also Blackstock v.
Champlain Enters.*, No. 03-CV-3448, 2004 WL 1616361, at *5
(S.D.N.Y. July 19, 2004) ("[A] departure from established
procedures may provide support for an inference of
discrimination in some contexts.")

The parties dispute why the OCA chose to reclassify
four Assistant Deputy Chief Clerk positions and whether the OCA
adhered to its internal reclassification policy when it chose to
do so. The OCA claims that the Civil Court used the
reclassification process for labor relations, personnel and
operations reasons. (Def.'s 56.1 ¶¶ 45-47; Baer Aff. ¶¶ 6-7;
Def.'s Mem. in Supp. at 5 and documents cited therein.) Instead
of creating four vacancies and hiring new employees from outside
the UCS, which would have required eliminating lower-level
support staff, reclassification saved money and prevented lay-
offs by promoting individuals already within the UCS to new job
titles. (Def.'s 56.1 ¶¶ 46-47.) Klings, on the other hand,
argues that the OCA used the reclassification process as a ruse
to promote the individuals it secretly favored. (Pl.'s Mem. in
Opp. at 14-16.)

The parties fiercely debate when an employee is considered an "incumbent" for purposes of invoking the reclassification policy, and, consequently, whether the OCA adhered to its internal reclassification policy when it reclassified the Assistant Deputy Chief Clerk positions. As neither the text of section 25.5 nor the UCS's official manual, the "Uniform Procedures for Appointment/Promotion and Guidelines for Screening Interview and Selection," provide an express definition of "incumbent" (see N.Y. Comp. Codes R. & Regs. TIT. 22, § 25.5; UCS Manual), both parties proffer competing interpretations.

The OCA advocates for a sweeping definition of "incumbent" that could classify any current employee as an "envisioned incumbent" for a newly created position. (See Baer Dep. at 61.) The OCA argues that incumbents need not be from a "direct line of promotion," especially for newly-reclassified positions like Assistant Deputy Chief Clerk, where no direct line to that position exists. (Def.'s 56.1 ¶ 91; Def.'s Mem. in Supp. at 4 and documents cited therein.) Specifically, the OCA contends that all four men were "incumbents," because they were all court clerks, and Chief Clerk Baer chose to reclassify court clerks. (Def. Mem. in Supp. at 11.) The OCA contends it was therefore inconsequential that two of the men held the position of Associate Court Clerk, as opposed to Principal Court Clerk,

31

before their reclassifications.  (Def. Mem. in Supp. at 11; Baer
Aff. ¶ 9.)  The OCA asserts that, based on its proffered
definition of incumbent, the four men met the procedural
requirements for reclassification, and thus, the OCA adhered to
the section 25.5 reclassification policy when it promoted them
to Assistant Deputy Chief Clerk without first posting the job
opportunities or holding interviews for the positions.  (Def.'s
Mem. in Supp. at 11-13 and documents cited therein.)

On the other hand, Klings advocates for a narrow
definition of the word "incumbent," which appears to limit
incumbents to employees who already hold the closest subordinate
title in their respective courts.  (Pl.'s Mem. in Opp. at 14-16
(arguing that she was the "true incumbent" for the Assistant
Deputy Chief Clerk in Kings County.)  Because none of the four
men held the Principal Court Clerk position in Kings County
Civil Court before the reclassification, Klings contends that
she, and not they, was the incumbent for the position in Kings
County Civil Court, and therefore, the defendant impermissibly
(and intentionally) circumvented the requirement to formally
post and interview for the job in order to avoid promoting her.
(*Id.* at 16)  In further support for her argument that the OCA
misused the reclassification process, Klings points to the
affidavit of Jeanne Colucci, Director of Personnel for the UCS,
which Klings argues demonstrates that the formal

reclassification requests themselves were a mere formality. (Colucci Aff. ¶ 14 (stating that "[i]t was helpful that the reclassification request forms . . . reflected the future court assignments the four reclassified incumbents were anticipated to receive, instead of [their] then-current assignments.").) Klings ultimately contends that the secrecy surrounding the reclassification process, as well as the OCA's deviation from its written rules and usual practice, raises credibility questions about whether the reclassification process was used for a discriminatory purpose.

Notwithstanding the parties' disagreements on these issues, for purposes of this motion only, the court will accept plaintiff's definition of "incumbent" and assume that the OCA failed to follow its own procedures when it reclassified the men. We now turn to whether this presumed deviation, when combined with Klings's other proffered evidence, supports an inference of gender discrimination sufficient to defeat summary judgment. *See, e.g.*, *Feldman v. New York Blood Ctr.*, No. 00-CV-8795, 2002 WL 31769700, at *7 (S.D.N.Y. Dec. 11, 2002) (evidence that employer transferred someone with less than six months experience, thus deviating from its promotion and transfer policy, insufficient standing alone to establish pretext); *Bucknell v. Refined Sugars, Inc.*, 82 F. Supp. 2d 151, 158 (S.D.N.Y. 2000), *aff'd*, 225 F.3d 645 (2d Cir. 2000) (even if

33

employer deviated from relying on its standard seniority

principles, such is insufficient to establish pretext).

    ii.   <u>The Lack of Documentation of Criticism of Klings's</u>
             <u>Work Performance</u>

       Klings argues that the criticisms of her personality

and work performance set forth in the defendant's motion papers,

affidavits, and depositions are unfounded, undocumented and

stereotypical, and raise issues of fact as to whether the

criticisms contained therein are simply a pretext for gender

animus. (Pl.'s Mem. in Opp. at 16-23; *see generally* Doc. No.

47, Declaration of Margaret McIntyre ("McIntyre Decl."), Ex. 3,

1996-2000 Performance Evaluations of Klings.) While defendant

concedes that none of Klings's criticisms have been memorialized

in her written evaluations (Def.'s 56.1 ¶ 99), it attempts to

decrease the significance of this fact by asserting that

Klings's supervisors "deliberately refrained from criticizing

her in writing, because they considered her thin-skinned and

wanted to bolster her self-esteem." (Def.'s Mem. in Supp. at 16

and documents cited therein; *see also* Tropea Aff. at ¶¶ 7, 8

(stating it was his "management practice to give mostly all

employees positive feedback and high performance evaluation

ratings" to avoid "unnecessary conflict, in-fighting and

jealousy," and that particular problems were handled orally in

private); Doc. No. 42, Ex. FF (attaching Klings's comments

seeking higher marks on her performance evaluation, where she
received a rating of 4 out of 5).)  Klings's supervisors claim
to have conveyed the same criticisms they now detail in their
motion for summary judgement to Klings orally behind closed
doors, and assert that, in response, Klings showed no signs of
improvement.  (Tropea Aff. at ¶ 2-3, 8; Feigel Dep. at 85-86,
132, 159-152, 171-72.)  For example, Angelo Tropea, an Assistant
Deputy Chief Clerk in the Civil Court, Kings County, stated that
he sat in on numerous "private" meetings with Klings and Deputy
Chief Clerk Stewart Feigel, where they discussed "negative"
issues with her performance.  (Tropea Aff. ¶ 3; Feigel Dep. at
85, 132, 150; *see also* Def.'s Mem. in Supp. at 6-7 and documents
cited therein.)  Klings, however, denies under oath ever meeting
with supervisors to discuss negative criticism of her work or
receiving any indication that she was performing her duties in
an unsatisfactory manner.  (Klings Decl. ¶¶ 20, 25-28; Pl.'s
Mem. in Opp. at 17.)

    Defendant correctly asserts that, standing alone,
conclusory assertions of lack of actual knowledge of poor
performance are not persuasive of pretext.  *See Brollosy v.
Margolin, Winer & Evens, LLP*, No. 04-CV-0873, 2006 WL 721433, at
*9 (E.D.N.Y. Mar. 20, 2006) ("Courts in this Circuit have found
'the fact that an employee was unaware of [her] employer's
dissatisfaction is irrelevant to a court's inquiry on the

issue.'" (quoting *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 310-11 (S.D.N.Y. 2000))); *Gambello v. Time Warner Comms., Inc.*, 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002) (noting that defendants "still would be entitled to summary judgment" even if they "had not made plaintiff aware of his poor performance"). Here, however, despite the numerous affidavits submitted and depositions taken from OCA supervisors, many expressing criticism of Klings's personality and work performance, not a single one of these sentiments has been memorialized in Klings's written evaluations. Only after the filing of this case, in sworn affidavits and depositions, are such negative critiques documented on the record. Taken at its minimum, the stark disparity between Klings's complimentary written performance evaluations, and the criticisms now being asserted, coupled with Klings's sworn denial that she was orally counseled about these criticisms, creates a genuine issue of fact for the jury's determination. *See Collins v. Cohen Pontani Lieberman & Pavane*, No. 04-CV-8983, 2008 WL 2971668, at *11 (S.D.N.Y. July 31, 2008) (finding issue of pretext requires credibility determination that is inappropriate for summary judgment stage, when employer cannot cite any written record of plaintiff's poor performance during her tenure).[15]

---

[15] Additionally, Klings proffers multiple affidavits from her subordinates, attesting, *inter alia*, that Klings was a "very competent," "above average supervisor" who "went above and beyond what was expected of her," "was

In addition to the lack of documented criticism and plaintiff's denial of oral criticism, is the *substance* of these undocumented criticisms and justifications, from which a fact-finder could reasonably infer that "pretext served to mask unlawful discrimination." *Byrnie*, 243 F.3d at 103. To the extent that plaintiff asserts that the criticism raises issues of sexual stereotyping, "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded in part on other grounds by statute*, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1074; *see also Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 119-20 (2d Cir. 2004) ("It is the law, then, that 'stereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision." (quoting *Price Waterhouse*, 490 U.S. at 251)). Furthermore, supervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made. *See Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).

Klings admits that she has never been subjected to any outright discriminatory comments based on her gender. (Def.'s

---

helpful," "fair," "open and available for questions," "compassionate to people's personal needs," "approachable and more than willing to help." (Doc. Nos. 51-59.) These affidavits directly contrast with the descriptions of Klings's management style proffered by defendant.

56.1 ¶ 85.)  However, several statements made by Klings's

superiors reflect general criticisms that Klings asserts could

be construed to infer a discriminatory motive as to why she was

not selected for the Assistant Deputy Chief Clerk position.

Angelo Tropea, who had supervised Klings in Kings County since

1996, criticized her "rigid personality, micromanagement style,

and difficulties interacting with people." (Doc. No. 42, Tropea

Aff. ¶ 2.)  In defending why he never recorded these criticisms

in writing, Tropea stated that Klings is "very thin-skinned, so

that even the mildest of criticism would result in a torrent of

detailed 'rebuttals' and aggravation." (Tropea Aff. ¶ 5.)

Moreover, despite commending her "work ethic and technical

knowledge," Chief Clerk Baer justified Klings's non-selection by

stating that her "natural limitations" made her undesirable for

upper-level management. (Baer Aff. ¶ 5.)  He listed some of

these limitations, including "slow production and decision-

making, personality issues [and] micromanagement practices."

(*Id.*)  His affidavit then contrasted plaintiff's purported

character traits with the four men selected.[16]

---

[16] "Each [of these men] possessed desirable traits that I considered necessary
to perform the management job successfully: leadership skills, motivational
skills, decisiveness, initiative, flexibility and good communication . . .
[i]t mattered not whether they had graduated college, or worked in a large or
small court, or whether they were Principal Court Clerks or Associate Court
Clerks, so long as they had the qualities I was looking for in someone to run
my court.  We take our talent where we find it." (Baer Aff. ¶ 9.)

While these remarks are not blatantly sexist, they clearly reflect a distaste for Klings's strict workplace management style, which, in turn, a jury could find are based on a gender bias: that women do not have leadership and motivational skills, cannot manage aggressively, and are not decisive and flexible, and that women are too "thin-skinned" to handle any negative feedback. This sentiment is furthered by Baer's statement that Klings's "natural limitations," or immutable character traits, precluded reclassification, whereas, in Baer's opinion, the four men chosen did not possess the same "natural" hindrances.

Thus, the OCA's failure to make contemporaneous written records of its complaints about Klings's managerial style and poor working relationships with others, contrasted with Klings's positive written evaluations, "requires a credibility determination that is properly made by a jury." *Collins*, 2008 WL 2971668, at *11; *see also Ramos v. Marriott Intern., Inc.*, 134 F. Supp. 2d 328, 345 (S.D.N.Y. 2001) ("Summary judgment should be granted sparingly when [employer's] intent is at issue.") The unresolved factual disputes surrounding the OCA's reclassification procedure, coupled with the disparity between Klings's work evaluations, her denial of receiving private oral criticism, and the questionably stereotypical justifications for her non-selection, present

sufficient evidence from which a jury could draw an inference of gender discrimination. Because the full range of circumstantial evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that Klings's non-selection for reclassification was motivated at least in part by gender discrimination, the court denies the OCA's motion for summary judgment on Klings's gender discrimination claim.

**CONCLUSION**

Defendant's motion for summary judgment as to plaintiff's claim of religious discrimination is granted and its motion as to plaintiff's gender discrimination claim is denied. By April 12, 2010, the parties shall submit a joint status letter by ECF, indicating how they wish proceed in light of this Memorandum and Order.


SO ORDERED.
Dated:   Brooklyn, New York
         April 5, 2010

                                   /s/
                          _____
                          KIYO A. MATSUMOTO
                          United States District Judge
                          Eastern District of New York